## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHANNON REEVES, THURUPARAN MANOHARAN, ANTHONY GARCIA, and MATTHEW HOWARD, as representatives of a class of similarly situated persons, and on behalf of the Maersk Inc. Savings Plan, <br><br> Plaintiffs, <br><br> v. <br><br> MAERSK INC., MAERSK AGENCY USA INC., MAERSK INC. PENSION COMMITTEE, MERCER INVESTMENTS LLC, and JOHN HANCOCK TRUST COMPANY, LLC, <br><br> Defendants. | Case No. _____ |

## CLASS ACTION COMPLAINT

### I.     NATURE OF THE ACTION

1.     Plaintiffs Shannon Reeves, Thuruparan Manoharan, Anthony Garcia, and Matthew Howard (collectively, "Plaintiffs"), as the representatives of the Class (as defined herein), and on behalf of the Maersk Inc. Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), against Maersk Inc. and Maersk Agency USA Inc. (collectively "Maersk"), the Maersk Inc. Pension Committee (the "Committee"), Mercer Investments LLC ("Mercer"), and the John Hancock Trust Company, LLC ("John Hancock") (collectively, the "Defendants").

2.     During the period beginning six years before the date this Complaint was filed and continuing through the date of final judgment (the "Class Period"), Defendants breached

and continue to breach their fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1) and

1105(a) by:

> (1) failing to prudently investigate, and imprudently selecting, a low-return fixed annuity contract with John Hancock (the "Hancock FA") as a Plan investment option when comparable alternative options with higher crediting rates and materially identical risk were available;

> (2) failing to prudently monitor and replace the Plan's Hancock FA investment option;

> (3) imprudently enabling the Plan to engage in prohibited transactions with a fiduciary and party in interest, John Hancock;

> (4) knowingly participating in and/or concealing breaches of fiduciary duty by co-fiduciaries, enabling co-fiduciaries to commit breaches of fiduciary duty, and/or knowingly failing to take reasonable measures to cure any co-fiduciaries' breaches of fiduciary duty; and

> (5) mismanaging the Plan to the detriment of all Plan participants by failing to—

>> (a) adopt, maintain, and employ a prudent investment evaluation process, including the use of requests for information ("RFIs") and requests for proposals ("RFPs") for competitive bidding and an appropriate selection,

>> (b) adopt, maintain, and employ prudent policies and practices to review and monitor the Plan's investment options on an ongoing basis and to remove or replace imprudent ones,

>> (c) provide adequate disclosure to Plan participants concerning investment options and their terms, as well as the roles of Plan service providers and conflicted transactions with fiduciaries and parties in interest, and

>> (d) adopt and implement prudent policies and practices to avoid high provider spreads and prohibited transactions.

     3.     Defendants also violated and continue to violate ERISA, 29 U.S.C. § 1106 by

causing the Plan to engage in and maintain a transaction they knew or should have known

constitutes a direct furnishing of services between the Plan and a party in interest – namely,

the investment contract with John Hancock, a Plan fiduciary and party in interest that has

served as the Plan's Trustee, Recordkeeper, and Investment Manager.

4.      Defendants' failure to remove and replace the Plan's consistently underperforming Hancock fixed annuity investment option and mismanagement of the Plan resulted in substantial losses to the Plan recoverable from Defendants under ERISA, 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3).

5.      Plaintiffs bring this action on behalf of the Class and the Plan pursuant to 29 U.S.C. § 1132(a) to compel Defendants to (a) make good to the Plan all losses and restore to the Plan all profits resulting from their breaches of fiduciary duties and prohibited transactions and (b) implement prudent policies and processes and other remedial measures to prevent further losses to the Plan.

II.    **SUMMARY OF CLAIMS**

6.      ERISA imposes strict fiduciary duties upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of:
>
> (i)    providing benefits to participants and their beneficiaries; and
> (ii)   defraying reasonable expenses of administering the plan; [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

These fiduciary duties of loyalty and prudence have been described as "the highest known to the law." *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan and Trust v. State Street Bank & Trust, Co.*, 931 F. Supp. 2d 296, 304 (D. Mass. 2013) (cleaned up). The United States Supreme Court has stated that a plaintiff "may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove

imprudent ones," *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015), and that "[i]f the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty," *Hughes v. Northwestern Univ.*, 595 U.S. 170, 176 (2022). The Supreme Court also has made clear that the fiduciary duty to continue to monitor the prudence of each investment option is separate from and in addition to the fiduciary duty to exercise prudence in initially selecting an investment. *Tibble*, 575 U.S. at 529.

7.      ERISA also imposes strict restrictions on transactions between a retirement plan and parties in interest or fiduciaries. 29 U.S.C. § 1106 states, in relevant part:

**(a) Transactions between plan and party in interest**

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . .

(C) furnishing of goods, services, or facilities between the plan and a party in interest; [or]

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

**(b) Transactions between plan and fiduciary**

A fiduciary with respect to a plan shall not--

(1) deal with the assets of the plan in his own interest or for his own account, [or]

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries . . . ."

8.      ERISA also imposes co-fiduciary liabilities on plan fiduciaries for knowingly participating in or concealing a breach of fiduciary duty by another fiduciary, enabling another

fiduciary to commit a breach of fiduciary duty, or knowingly failing to take reasonable measures to cure any breach of fiduciary duty. 29 U.S.C. § 1105(a).

9.     ERISA provides for the remedies in civil actions to enforce these strict requirements in two provisions. 29 U.S.C. § 1109(a) provides, in pertinent part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

and 29 U.S.C. § 1132(a) provides, in pertinent part:

> A civil action may be brought . . .
>
> (2) . . . by a participant [or] beneficiary for appropriate relief under section 1109 of this title; [or]
>
> (3) by a participant [or] beneficiary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

10.     Defendants failed to act with the care, skill, prudence, and diligence required of ERISA fiduciaries in investigating, selecting, failing to monitor, and failing to remove and replace the Plan's fixed annuity investment option, the Hancock FA.

11.     Defendants had (and continue to have) a fiduciary obligation to prudently seek, select, and switch to an available fixed annuity product with comparable investment objectives and risk by soliciting proposals from and negotiating with fixed annuity providers that were not parties in interest to the Plan. On information and belief, Defendants have never done this. Had Defendants done so, they would have been able to secure a fixed annuity product with significantly higher "crediting rates" (which is how fixed annuity contracts measure their

investment returns) for a similar level of risk. Defendants' failure to prudently seek and select a fixed annuity investment is a violation of their fiduciary duties under ERISA, 29 U.S.C. 1104(a)(1).

12.     Defendants' failure to periodically review and monitor the Hancock FA also is a violation of their fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1) and 1105(a). Had they prudently monitored the fixed annuity marketplace and sought competing proposals, they would have discovered that the Hancock FA's crediting rates were far below market and replaced it with a superior option. Instead, Defendants sat idly by as Plan participants lost millions of dollars due to the Hancock FA's inferior crediting rates.

13.     As the Plan Administrator, Maersk had a duty to monitor the performance of the Committee to ensure that it performed its fiduciary role competently and consistent with ERISA's stringent requirements and Plan documents and to act swiftly to protect the Plan and participants when it failed to do so. As the Committee, Mercer, and John Hancock persisted in failing to prudently monitor the Plan's fixed annuity option, Maersk had a duty to intercede but failed to do so. Maersk also failed to ensure that the Plan had in place prudent policies and practices to guard against prohibited transactions and to investigate, select, monitor, and replace imprudent investment options for Plan participants.

14.     Defendants' persistent failure to prudently monitor the Plan's fixed annuity contract has caused the Plan to suffer approximately $10-$22 million in losses since September 1, 2019. These losses continue to accrue as a result of Defendants' ongoing fiduciary failures.

15.     Defendants also caused the Plan to engage in prohibited transactions in violation of ERISA, 29 U.S.C. § 1106, since the Hancock FA contract obligates the Plan to

use Plan assets to pay a party in interest, John Hancock (the Plan's Trustee, Recordkeeper, and Investment Manager), to provide services to the Plan.

16.     Defendants also breached their fiduciary duties by mismanaging the Plan in several significant respects, as set forth in paragraph 2 above.

17.     Plaintiffs seek recovery on behalf of the Plan of the losses caused by Defendants' breaches of fiduciary duty and prohibited transactions, the profits reaped by John Hancock and Mercer as a result of those violations, and injunctive and other equitable relief sufficient to prevent similar prohibited transactions and imprudent investment selection and monitoring practices from harming Plan participants and beneficiaries in the future.

### III.    JURISDICTION AND VENUE

18.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case presents a federal question and has exclusive jurisdiction of this case under ERISA, 29 U.S.C. § 1132(e)(1).

20.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

21.     Venue is proper in this district pursuant to ERISA, 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391(b) because it is a district where ERISA violations occurred, where a substantial part of the events or omissions giving rise to the claims occurred, and where the

Defendants conduct business and reside or may be found.

22.     In conformity with 29 U.S.C. §1132(h), Plaintiffs served this Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury or will have done so shortly after filing this Complaint.

## IV.     THE PARTIES

### A.     The Plaintiffs

23.     Plaintiff Shannon Reeves is a resident of the Commonwealth of Virginia and was a participant in the Plan during the Class Period.  She held the Hancock FA in her Plan investment portfolio during the Class Period. Plaintiff Reeves' account is subject to lost earnings relative to what her account value and ultimate distribution amount would have been had Defendants prudently investigated, selected, and monitored the Plan's fixed annuity investment and replaced the Hancock FA with a prudent alternative fixed annuity.

24.     Plaintiff Thuruparan Manoharan is a resident of the state of New Jersey and was a participant in the Plan during the Class Period. He held the Hancock FA in his Plan investment portfolio during the Class Period. Plaintiff Manoharan's account is subject to lost earnings relative to what his account value and ultimate distribution amount would have been had Defendants prudently investigated, selected, and monitored the Plan's fixed annuity investment and replaced the Hancock FA with a prudent alternative fixed annuity.

25.     Plaintiff Anthony Garcia is a resident of the Commonwealth of Pennsylvania and was a participant in the Plan during the Class Period. He would have diversified his Plan portfolio during the Class Period by investing in a fixed annuity or comparable investment with the same objectives of preserving principal and avoiding market volatility and with a comparable level of risk if one had been offered with reasonable returns, but he was denied

such an opportunity due to Defendants' failure to prudently investigate, select, monitor, and replace the Hancock FA. The Hancock FA, with its unreasonably low crediting rates, was the only fixed annuity offered in the Plan throughout his participation in the Plan.

26.    Plaintiff Matthew Howard is a resident of the State of North Carolina and was a participant in the Plan during the Class Period. He would have diversified his Plan portfolio during the Class Period by investing in a fixed annuity or comparable investment with the same objectives of preserving principal and avoiding market volatility and with a comparable level of risk if one had been offered with reasonable returns, but he was denied such an opportunity due to Defendants' failure to prudently investigate, select, monitor, and replace the Hancock FA. The Hancock FA, with its unreasonably low crediting rates, was the only fixed annuity offered in the Plan throughout his participation in the Plan.

27.    Plaintiffs have standing to bring this action on behalf of the Plan under Article III of the Constitution for the following reasons: (a) Plaintiff Shannon Reeves' and Plaintiff Thuruparan Manoharan's account balances and ultimate distributions from the Plan would be higher had Defendants prudently selected, monitored, and replaced the Hancock FA; (b) Plaintiffs Anthony Garcia and Matthew Howard were denied an opportunity to invest in a prudent fixed annuity or other comparable investment with the objectives of preserving principal and avoiding market volatility and comparable risk but with reasonable returns; and (c) all Plaintiffs suffered injuries due to Defendants' mismanagement of the Plan as alleged herein.

28.    The above-referenced injuries to Plaintiffs are fairly traceable to Defendants' unlawful conduct in managing the Plan and are likely to be redressed by a favorable judgment providing appropriate monetary and equitable relief to Plaintiffs and the Class.

8

29.    Defendants' unlawful conduct is ongoing, continuing through the date this Complaint was filed.

30.    Plaintiffs and all participants in the Plan did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed, including, among other things, the availability of fixed annuity investment contracts with similar risk and superior crediting rates, the relative bargaining power of the Plan in the marketplace and the impact upon its ability to negotiate for better terms, and information regarding reasonable spreads for fixed annuity providers.

31.    In addition, Maersk obfuscated and hid from Plan participants about as much as it could about the Hancock FA and the prohibited transaction with John Hancock. The Maersk 2019-2023 5500 forms,[1] which are required annual reports of employee benefit plans under ERISA, stated that the Plan entered into an "investment contract" with John Hancock Trust Company, LLC, yet no details were provided as to the nature of this investment contract. Other 5500 form statements about John Hancock are similarly cryptic and incomplete. For example, the Notes to the Financial Statements included with the 2019-2023 5500 forms state that "*[c]ertain* Plan investments are managed by John Hancock" and that "*these* transactions qualify as party-in-interest transactions" (emphasis added), but do not describe *which* investments are managed by John Hancock or *what* transactions qualify as party-in-interest transactions, further concealing the prohibited transaction concerning the Hancock FA.

32.    Defendants have concealed other material terms of the Hancock FA contract from Plan participants, including its term, its underlying assets, its spread, how its crediting rate is determined, its restrictions on transfer, termination, or competing investments that may

---

[1] Maersk has not yet filed its Form 5500 for 2024.

result in lost value, its General Account Book Value Yield, and John Hancock's spread (the difference between the investment revenues it earned on the underlying assets and the crediting rate).

33.     Maersk also alternatively described the Hancock FA contract in different ways, making it difficult for Plan participants to identify and understand the investment. The Schedules of Assets included with the 5500 forms do not even mention John Hancock. Instead, under the forms' heading "Identity of Issuer, Borrower Lessor, or Similar Party," Maersk listed the investment contract with John Hancock vaguely as "Maersk stable value fund" (there is no actual stable value fund issued by Maersk) and by yet another name, "New York Life Investments," without any explanation. Further, under the 5500 forms' heading "Description of Investment, Including Maturity Date, Rate of Interest, Collateral, And Par or Maturity," Maersk listed only "NYLIC Anchor Account," again failing to provide any connection to the investment contract with John Hancock and failing to disclose the maturity date or the rate of interest as required – all further hiding the prohibited transaction. Compounding this obfuscation, Maersk's periodic Disclosure Documents (known as 404a-5 forms because they are required under ERISA, 29 CFR § 2550.404a-5) identify the Hancock FA contract only vaguely as "Stable Value Option" and Plan participant account statements identify the contract by yet another designation: "NYL Insurance Anchor IV." All of these different designations and failures to disclose make it difficult if not impossible for Plan participants to identify, understand, and track information relating to the Hancock FA.

34.     Maersk also failed to disclose John Hancock as the Plan's Trustee and Investment Manager on Schedule C of the Plan's 2019-2023 5500 forms as required. Schedule C requires disclosure of service providers receiving direct or indirect compensation "in

connection with services to the plan or their position with the plan during the plan year." Schedule C is the primary place one looks for such service providers; that is the required Schedule's sole purpose. By failing to disclose John Hancock Trust Company, LLC as a Trustee and Investment Manager on Schedule C, Maersk not only violated ERISA but also hid Hancock's prohibited transaction and fees, as well as all the other information about Hancock's relationship with the Plan that is required by Schedule C. Maersk hid the fact that John Hancock, the Plan's Trustee and a party in interest subject to ERISA's prohibited transaction rules, was also a Plan Investment Manager. Maersk cannot pass the blame for this failure to John Hancock, since part II, line 4 of the 5500 form requires Maersk to disclose if any service provider has failed or refused to provide information necessary to complete the Schedule and Maersk did not do so.

35.    Maersk failed to disclose John Hancock as the Plan's Trustee and Investment Manager on Schedule C of the 5500 forms notwithstanding that it properly disclosed John Hancock's affiliate, John Hancock Retirement Plan Services, on Schedule C as the Plan's Recordkeeper, suggesting that Maersk's omission of John Hancock was intentionally designed to hide John Hancock's role as Trustee and Investment Manager and the prohibited transaction. This suggestion is buttressed by the additional fact that Maersk omitted any mention of John Hancock on the Schedule of Assets accompanying the 5500 forms, which list all of the Plan's investments. Further, as an Investment Manager, John Hancock is required to acknowledge in writing that it is a fiduciary with respect to the Plan under ERISA, 29 U.S.C. § 1002(38)(C), yet on information and belief it has not done so and Maersk has failed to require it to do so.

36.    Defendants also have concealed from Plan participants other material facts concerning their claims, including: the fiduciaries' management practices in investigating,

selecting, reviewing, monitoring, and replacing Plan investments; the relationship and agreement between John Hancock Trust Company, LLC and New York Life Insurance Company; and the material terms of the Trust Agreement between the Plan and John Hancock.

### B.    The Defendants

37.    Maersk Inc. is a global transport and logistics company. It is the main United States unit of Denmark-based container shipping company Maersk Line, which is a subsidiary of shipping giant A.P. Møller - Maersk. Maersk Inc. handles inland services for Maersk Line's 600 vessels, while its Maersk Line affiliates provide trucking and logistics services. The unit's network of about 100 offices in the U.S., Canada, Central America, and the Caribbean also arranges for customs house brokerage, storage, and electronic tracking and documentation. In this Complaint, "Maersk" refers to Maersk Inc. and its parent, subsidiaries, affiliates, predecessors, and successors to which these allegations pertain.

38.    Maersk is incorporated in Delaware and has offices at 13 Centennial Drive, Peabody, MA 01960. It also has shipping operations at the Port of Boston's Conley Container Terminal.

39.    The Plan's 2019-2023 5500 forms list Maersk Inc. as the Plan Sponsor, as defined in 29 U.S.C. § 1002(16)(B), and Plan Administrator, as defined in 29 U.S.C. § 1002(16)(A). The Supreme Court has found that a Plan Administrator is a "trustee-like fiduciary." *CIGNA Corp. v. Amara*, 563 U.S. 421, 437 (2011); *see Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 6 (2004) (ERISA "establishes standards of fiduciary conduct for plan administrators"). Among other things, Maersk has exercised and continues to exercise discretionary authority and control with respect to the Plan's operation, management, and administration, including by appointing and monitoring the performance of

the Committee and its members, replacing Committee members as appropriate, selecting and compensating providers of administrative services to the Plan, determining and approving prudent Plan policies, practices, and other terms and operational rules set forth in the Plan's governing documents, ensuring compliance with Plan documents and ERISA requirements, and having the discretion and authority to amend or terminate the Plan in whole or in part. It may also exercise authority concerning the selection, monitoring, and replacement of investment options. Maersk is therefore a fiduciary of the Plan as defined by 29 U.S.C. § 1002(21)(A)(i) and (iii).

40.    Maersk Agency USA Inc. is a wholly-owned subsidiary of Maersk.

41.    Maersk, Inc. Pension Committee is composed of senior officers or directors of Maersk. The Plan's 2019-2022 5500 forms state: "The Pension Committee, appointed by the Board of Directors of Maersk Inc. serves as fiduciary of the Plan and has responsibility to exercise discretionary control over the Plan's management and administration." The Plan's 2023 5500 form substitutes "Board of Directors of Maersk Agency USA Inc." for "Board of Directors of Maersk Inc." The names of Committee members are presently unknown to Plaintiffs but, upon discovery, such members may be added as Defendants in this action.

42.    Mercer Investments is a worldwide asset management firm and an investment adviser registered with the United States Securities and Exchange Commission. It is headquartered in Boston, MA at 99 High Street, Boston, MA 02110. Mercer offers investment consulting and investment management services to its clients, including the Maersk Plan. Mercer's website states: "[W]e are the investments consultant for outsourced discretionary assets under management, managing more than US$415bn."

43.    The Plan's 2019-2023 5500 forms list Mercer as the Plan's sole Investment Advisor. In addition, the Plan's 2022 and 2023 5500 forms state that Mercer received investment management fees, yet Maersk did not designate Mercer as an Investment Manager on Schedule C of the 5500 forms. Part II, line 4 of the 5500 form requires Maersk to disclose if any service provider has failed or refused to provide information necessary to complete the Schedule and Maersk did not do so. As a compensated Investment Advisor (and possibly Investment Manager as well) that has rendered investment advice for the Plan or has had authority or responsibility to do so, Mercer is a fiduciary of the Plan as set forth in ERISA, 29 U.S.C. § 1002(21)(A). Mercer may also be a fiduciary as an Investment Manager as well, under ERISA, 29 U.S.C. § 1002(38). If Mercer was an Investment Manager, it would have been required to acknowledge in writing that it is a fiduciary with respect to the Plan under ERISA, 29 U.S.C. § 1002(38)(C).

44.    John Hancock Trust Company, LLC, a wholly-owned subsidiary of Manulife Financial Corporation, is a New Hampshire non-depository trust company that provides trust and custodial services to retirement plans, offers an Individual Retirement Accounts product, and maintains specific Collective Investment Trusts. John Hancock, along with its corporate parent Manulife Financial Corporation, is headquartered in Boston, MA and has corporate offices at 200 Berkeley Street, Ste 7, Boston, MA, 02116, 601 Congress Street, Boston, MA 02210, and 197 Clarendon Street, Ste 4, Boston, MA 02116.

45.    John Hancock is the Plan's Trustee and its affiliate, John Hancock Retirement Plan Services, is the Plan's Recordkeeper. The Notes to the Financial Statements accompanying the Plan's 2019-2023 5500 forms state, under the heading "Administration

of the Plan": "John Hancock Trust Company LLC (the "Trustee") is the trustee of the Plan and John Hancock Retirement Plan Services provides recordkeeping and participant services." John Hancock Retirement Plan Services is not a defendant in this action and Plaintiffs do not allege any claims or seek any remedy concerning its recordkeeping fees.

46.    John Hancock is also a Plan "party in interest" under ERISA, 29 U.S.C. § 1002(14). The Schedule of Assets included with the Plan's 5500 forms designate the Hancock FA as a party in interest transaction. John Hancock has also served as the Plan's Investment Manager. The Plan's 2019-2023 5500 forms state: "Certain Plan investments are managed by John Hancock." John Hancock manages plan assets and investments in, at least, the Hancock FA and acquires or disposes of investments as necessary to implement Participant directions. The Report of Independent Auditors submitted with the 2019-2020 5500 forms states: "We have been informed by the Plan administrator that the Trustee holds the Plan's investment assets and executes investment transactions." As the manager of plan assets and investments and as the Plan Trustee, John Hancock is a fiduciary with respect to the Plan under ERISA, 29 U.S.C. §§ 1002(21)(A) and 1002(38)(C). As an Investment Manager, John Hancock is required to acknowledge in writing that it is a fiduciary with respect to the Plan under ERISA, 29 U.S.C. § 1002(38)(C).

## V.    DETAILED FACTUAL ALLEGATIONS

47.    The Plan is a "defined contribution plan" under ERISA, 29 U.S.C. § 1002(34) and 26 U.S.C. § 401(k). The purpose of the Plan is to provide retirement benefits to eligible Maersk employees through the deferral of pre-tax wages and the investment of the resulting contributions in a menu of investment options that are intended to be prudently selected and monitored by the Committee, its Investment Advisor, Mercer, and its Investment Manager,

John Hancock, pursuant to prudent Plan management processes and policies administered by Maersk as Plan Administrator.

48.    In defined contribution plans, each employee has an individual account. The benefits ultimately paid to the employee are determined by the amount the employee and employer contribute to the plan, the performance of the investments, and the expenses of the Plan. Unlike defined benefit plans, which provide for fixed payouts for life and where the employer assumes the risks and pays the fees and expenses of the investment, defined contribution plan accounts rise and fall with financial markets and the employee assumes the risk and pays the fees and expenses of the investment. With the proliferation of defined contribution plans in recent years, retirees are exposed to far more financial risk from the stock market and service providers seeking high spreads, including fixed annuity providers seeking to keep crediting rates low so they can earn higher profits from the spreads.

49.    Plan participants are limited to the investments selected by the Plan's fiduciaries and cannot choose alternative investments outside of the investments offered by the Plan, even when the Plan's investments are inferior and superior alternatives are available in the marketplace.

50.    The Notes to the Financial Statements accompanying the Plan's 2019-2023 5500 forms state: "The Plan is a party to a fully benefit-responsive investment contract with the John Hancock Trust Company, LLC ("John Hancock") . . . . John Hancock maintains the contributions in a general account. . . . There are no reserves against contract value for credit risk of the contract issuer or otherwise."

51.    The Hancock FA is classified as an Immediate Participation Guarantee ("IPG") Fixed Annuity, which relies on the single entity credit and liquidity risk of the issuer

and does not have a maturity date. Therefore, on information and belief, the Hancock FA has no maturity date.

52.     Defendants' breaches of fiduciary duties in agreeing to the Hancock FA and in concealing it from Plan participants are made all the more severe in light of the conflict of interest inherent in favoring a Plan fiduciary and party in interest – its own Trustee, Recordkeeper, and Investment Manager – by granting it an exclusive and unreasonably profitable contract to provide a certain investment to the Plan and maintaining that product for an unreasonably long time, in fact, indefinitely. Defendants have caused the Plan to be stuck indefinitely in this exclusive contract that is a breach of their fiduciary duties and a prohibited transaction under ERISA.

53.     Between 2019 and 2023, at year end, the Plan had assets ranging from approximately $573 million to $917 million. By amount of assets, the Plan ranked in the 99th percentile of all retirement plans in 2022. According to the Plan's 2023 5500 form, at the beginning of 2023, the Plan had 6,161 participants. By the number of participants, the Plan ranked in the 99th percentile of all retirement plans in 2022.

54.     Between 2019 and 2023, at year-end the Plan had approximately $78-$97 million invested in the Hancock FA, giving Defendants substantial bargaining power in the fixed annuity marketplace. And yet, these Defendants chose a fixed annuity contract offered by its own Trustee, Recordkeeper, and Investment Manager as its only fixed annuity investment option and maintained it as the Plan's only fixed annuity investment option for decades, despite its uncompetitive return, unreasonably high spread, and high risks.

55.     During the period 2019-2021, the Hancock FA was the second largest investment in the Plan; in 2022, it was the largest; and in 2023, it was the third largest. During

the period 2019-2023, investments in the Hancock FA represented between approximately 10.5% to 14.8% of total Plan assets, whereas the percentage of assets invested in general account fixed annuities by retirement plans with 100 or more participants and total assets in the $250-$999 million range was only 3.7% in 2022. This indicates that the Plan was unusually heavily invested in the Hancock FA. The fact that the Hancock FA represented such a substantial share of the Plan's assets increased its bargaining power and put Defendants on notice of the critical importance of: (a) ensuring that John Hancock was receiving a reasonable spread; (b) providing adequate disclosures about the Hancock FA and the Plan Trustee's, Recordkeeper's, and Investment Manager's conflicted interest in it; (c) employing prudent processes to investigate the availability of superior fixed annuities in the marketplace; and (d) employing prudent processes to monitor and replace the Hancock FA. Prudent fiduciaries, recognizing the importance of the fixed annuity in the Plan's investment menu, would have taken great care in selecting and monitoring this investment option, yet Defendants did not do so.

56.    The Plan had both the bargaining power and the means to implement a prudent process to investigate, select, and monitor fixed annuity products and to remove and replace the Hancock FA with a superior fixed annuity contract due to its consistently low crediting rates. Instead, Defendants caused the Plan to offer only a single, low-rate product from its Trustee, Recordkeeper, and Investment Manager.

57.    Institutional fixed annuities in retirement plans are specialty insurance products. They are intended to preserve principal and provide steady, positive, contractually guaranteed returns known as "crediting rates." They are not investment securities like mutual funds. Instead, they are individually negotiated contracts entered into between a retirement

plan and an insurance company. The crediting rate is set and reset at the discretion of the insurer.

58.    Fixed annuities are not only structured differently than mutual funds, but the relevant marketplace is different, as are the tools available to monitor and compare the product's performance to competing products. Fixed annuities differ from both mutual funds (including money market funds) and bond funds in that they are not registered with the Securities and Exchange Commission or subject to a high level of regulation and transparency. They are only subject to inconsistent and relatively weak state regulation. For a Plan with substantial fixed annuity assets such as the Plan, monitoring fixed annuity products requires evaluating the terms and conditions of the fixed annuity contract, researching the relevant market, and testing the market by, among other things, issuing RFIs and RFPs to solicit bid proposals.

59.    Accordingly, it is a best practice for plans with substantial participant investments in fixed annuities to solicit competitive bids to initially select a fixed annuity contract, monitor opportunities in the marketplace on an ongoing basis, and periodically solicit additional competitive bids.

60.    Given Maersk's substantial funds available for fixed annuity investments, the Committee, Mercer, and John Hancock should have acquired certain critical information as part of a prudent process of investigating, selecting, monitoring, and deciding to replace a fixed annuity investment like the Hancock FA, and Maersk should have ensured that such a process was adopted and implemented. Such due diligence should have included, at a minimum:

- The average rate history of the product over standard time intervals, including the 5-year average;

- The rates offered by competing products to similar plans, including current, minimum, and long-term average rates;

- The provider's profit spread and how that spread compares with competitors' products; and

- Additional factors that determine whether a product's level of risk is appropriate, including the credit quality of the product provider.

61.     To implement a prudent process, a plan should seek the assistance of a professional advisor and investment manager independent of the annuity provider, as the members of a plan's investment committee typically do not possess sufficient expertise to competently select, monitor, and evaluate the fixed annuity marketplace. Further, the plan's fiduciaries cannot rely upon advice and management from the plan's Trustee or Recordkeeper, such as John Hancock here, since they have financial incentives to persuade the Plan to contract with them or select their proprietary product or the proprietary product of another entity with whom they have a relationship and to maintain such contract and product. Unlike with mutual funds, the lower the returns a fixed annuity provider has to pay out to plan participants, the higher the profits for the provider (i.e., the spread). The interests of the Maersk Plan participants in obtaining higher crediting rates are therefore adverse in this respect to Plan insider John Hancock's interests in keeping its spreads high. That conflict of interest is precisely the reason such transactions are prohibited under ERISA.

62.     The Committee did not conduct a prudent due diligence process with respect to the Hancock FA and Maersk failed to intervene or otherwise ensure that it did. On information and belief, Maersk and the Committee had no process or policy at all or for investigating, selecting, monitoring, and replacing fixed annuity products. Maersk's June 30, 2025 Disclosure Document for the Plan states that the "Inception Date" for the Hancock FA is January 3, 1995

and Maersk's 5500 forms going back as far as 2009 (which is the earliest 5500 form available online for the Plan) indicate that the Plan has not offered any other fixed annuity product.

63.    The Committee, Mercer, and John Hancock also failed to prudently monitor the Hancock FA and remove and replace it with a prudent investment, and again, Maersk failed to ensure that it did. Had Defendants monitored and evaluated the Hancock FA's crediting rates, or in Maersk's case, ensured that such a process was implemented, they would have known, if they did not actually know, that the investment underperformed year after year for the entire Class Period and likely for much longer. They should have known, if they did not actually know, that the Plan's Trustee, a party in interest owing duties of loyalty and prudence requiring it to act in participants' best interests, was benefitting from such low returns (i.e., higher spreads) at the expense of the Plan participants. By failing to take any preventive or corrective actions, they breached their own duties of loyalty and prudence.

64.    This is not a case of second-guessing or "hindsight is 20/20." It is, rather, a case of fiduciaries abdicating their responsibility to exercise due care. The crediting rate in a fixed annuity is not tied to the performance of a diversified pool of assets in which the investors have an interest but is controlled by parties in interest. Plan participants have no ownership in any assets underlying the Hancock FA; they only have a contract. They depend on their Plan fiduciaries to exercise due diligence and obtain a deal on their behalf in their best interests. Defendants had an opportunity and duty to evaluate and *re-evaluate* the fixed annuity and negotiate the terms relating to its crediting rate based on a comparison with other available similar fixed annuities in the marketplace in advance. They simply did not do so; they just took what their Trustee was offering and stuck with it.

65.    The fact that Defendants utterly failed to monitor and re-evaluate the Hancock

FA is demonstrated by the fact that there were better rates offered for the identical product in industry sources for fiduciaries, such as Fi360, which would have been readily available to Mercer and John Hancock, yet Defendants did nothing. For example, on June 30, 2023, the same fixed annuity as the one in the Plan was offered with a 3.68% crediting rate to financial institutions, advisors, consultants, asset managers, and service providers in the Fi360 database, while the Defendants stuck with their 3.36% rate for Plan participants at that time. On January 28, 2025, the same fixed annuity was offered with a 4.33% rate in the Fi360 database, while the Defendant stuck with their 3.61% rate for Plan participants at that time. Defendants *could have simply asked* John Hancock, the Plan's own Trustee, Recordkeeper, and Investment Manager, to at least match the better rate being openly offered for the Hancock FA to all Plans in the marketplace.

66.    Moreover, Defendants should have known in advance that substantially similar products were readily available from other providers during the entire Class Period that offered much higher returns to Plan participants. If Defendants had adopted and implemented a prudent process or policy, they could easily have selected or switched to a fixed annuity with a proven track record of competitive rates, such as the TIAA RC, MassMutual SAGIC, or Prudential GIC,[2] all of which were available to the Plan during the entire Class Period and were included in many other retirement plans. All of those are classified as IPG Fixed Annuities like the Hancock FA. All of those also had the same investment objective of preserving principal and providing stable returns with comparable levels of risk as the underperforming Hancock FA.

---

[2] A prudent fiduciary can negotiate rates near the GA rates. For example, International Brotherhood of Electrical Workers (IBEW) Local Union 400 recently negotiated a 6.8% rate on the Prudential GIC, a general account fixed annuity, for their 401(k) plan.

67.     The losses that Defendants should be ordered to "make good" to the Plan and John Hancock's profits that it should be ordered to "restore to such plan" under 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3) can both be measured by reference to certain comparators. The extent to which the Hancock FA caused the Plan to suffer substantial losses can be calculated based on a comparison with the crediting rates offered by the comparators referenced above. The profits that should be restored to the Plan can be calculated based on a comparison with John Hancock's General Account Book Value Yield ("GA").

68.     Plan participants' money that is invested in the Hancock FA is deposited into John Hancock's general account according to the Plan's 2019-2023 5500 forms, but its rate is determined by a subsection of the general account known as a separate account. On information and belief, the adjusted return of John Hancock's GA during the Class Period was most likely 6.8% or higher.

69.     Although the differential between the crediting rate Plan participants received and the crediting rate they should have received (based on comparators) provides the best measure of the losses Defendants should make good to the Plan as a result of their breaches of fiduciary duties and prohibited transactions, the spread between John Hancock's GA and the crediting rate John Hancock paid to participants invested in the Hancock FA is the best measure of the profits that should be restored to the Plan as a result of Defendants' violations.

70.     The chart below shows the losses that should be made good to the Plan and the profits that should be restored to the Plan, by reference to the TIAA RC, MassMutual SAGIC, and Prudential GIC (as negotiated by IBEW Local 400) comparators described above. The losses and profits figures are based solely on the Hancock FA as of the date of the filing of this Complete and are therefore incomplete at present. Pending discovery, they do

not yet include Mercer's profits based on its compensation as Investment Advisor (and possibly Investment Manager as well) or John Hancock's profits based on its compensation as Trustee and Investment Manager. Further, the amounts will continue to accrue through the date of final judgment. Nevertheless, the chart shows the minimum losses based on the comparators and the minimum profits based on the estimated GA:

| Period | 2019 (Sept.-Dec.) | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 (Jan.-Aug.) | Total Losses/ Profits |
|---|---|---|---|---|---|---|---|---|
| Hancock FA Rate | 2.28% | 2.30 | 1.96% | 2.52% | 3.36 | 3.70% | 3.61% | |
| MassMutual SAGIC Rate | 4.66% | 4.55% | 4.03% | 4.03% | 5.70% | 4.98% | 4.25% | |
| Hancock Spread vs. MassMutual | 2.38% | 2.25% | 2.07% | 1.51% | 2.34% | 1.28% | 0.64% | |
| TIAA RC Rate | 4.80% | 4.80% | 4.25% | 4.25% | 6.60% | 5.75% | 5.50% | |
| Hancock Spread vs. TIAA | 2.52% | 2.50% | 2.29% | 1.73% | 3.24% | 2.05% | 1.89% | |
| Prudential GIC Rate | 6.80% | 6.80% | 6.80% | 6.80% | 6.80% | 6.80% | 6.80% | |
| Hancock Spread vs. Prudential | 4.52% | 4.50% | 4.84% | 4.28% | 3.44% | 3.10% | 3.19% | |
| Est. Minimum Hancock GA | 6.80% | 6.80% | 6.80% | 6.80% | 6.80% | 6.80% | 6.80% | |
| Hancock Spread vs. GA | 4.52% | 4.50% | 4.84% | 4.28% | 3.44% | 3.10% | 3.19% | |
| Total Plan Assets | $78,142,381 | $88,598,825 | $90,991,507 | $97,045,104 | $96,431,887 | $95,000,000 | $95,000,000 | |
| Plan Losses vs. MassMutual | ($613,730) | ($1,993,474) | ($1,883,524) | ($1,465,381) | ($2,256,506) | ($1,216,000) | ($407,360) | **($9,835,975)** |
| Plan Losses vs. TIAA | ($492,297) | ($2,214,971) | ($2,083,706) | ($1,678,880) | ($3,124,393) | ($1,947,500) | ($1,202,985) | **($12,744,732)** |
| Plan Losses vs. Pru | ($883,009) | ($3,986,947) | ($4,403,989) | ($4,153,530) | ($3,317,257) | ($2,945,000) | ($2,030,435) | **($21,720,167)** |
| Hancock Profits | $883,009 | $3,986,947 | $4,403,989 | $4,153,530 | $3,317,257 | $2,945,000 | $2,030,435 | **$21,720,167** |

71.     Despite having the resources and bargaining power to access competitive fixed annuity products, the Plan has retained the same underperforming Hancock FA. Other

retirement plans with fixed annuity contract bargaining power comparable to Maersk's Plan have fared far better by selecting or switching to superior IPG fixed annuity products available in the marketplace. The participants in these plans have enjoyed substantially higher crediting rates than Maersk's Plan participants for a comparable level of risk.

72.      Defendants not only failed to adopt and employ a prudent policy or process, but they knowingly chose to select and maintain an *exclusive* contract with an entity (John Hancock or its affiliate) that held all three insider positions of Trustee, Recordkeeper, and Investment Manager, to furnish services to the Plan. They knowingly allowed this fiduciary and party in interest to deal with Plan assets and manage the very investment that it provided to the Plan and as to which its interests were adverse to the interests of Plan participants. They further allowed that fiduciary and party of interest to profit from an exceptionally heavy investment and unreasonably high spreads at the expense of Plan participants for the entire Class Period, while significantly concealing the facts from Plan participants. They all stood idly by as the Plan suffered enormous losses year after year from these conflicted and prohibited transactions, doing *nothing* to cure their co-fiduciaries' breaches of fiduciary duty. Maersk, for its part, failed to remove the Hancock FA or Mercer, John Hancock, or any member of the Committee for this conduct. It also failed to ensure that prudent investigation, selection, monitoring, and replacement processes were adopted and employed. It utterly failed to intervene in any way. In a word, the other Defendants enabled John Hancock, they enabled each other's breaches of fiduciary duty, and they enabled prohibited transactions. There can scarcely be imagined a more blatant example of a conflict of interest, breach of fiduciary duties, and prohibited transaction in a retirement plan. This is precisely what ERISA was enacted to prevent.

73.     29 U.S.C. § 1108(b)(2)(A) allows Plan fiduciaries to contract with a party in interest for administrative services, such as office space or legal or accounting services, that are "necessary for the establishment or operation of the plan," but only "if no more than reasonable compensation is paid therefor." It was not necessary to the operation of the Plan for it to choose one particular fixed annuity with low rates and unreasonably high spreads provided by such a conflicted insider and to maintain that unusually heavy investment and exclusive contract for the entire Class Period. It was not necessary for the Plan to favor its Trustee, Recordkeeper, and Investment Manager to the detriment of Plan participants, who were stuck with the low rates while their Trustee reaped unreasonably high profits for the entire Class Period.

74.     Other exemptions from ERISA's prohibited transaction rules are also unavailable for the same reasons. For example, the Hancock FA does not qualify for prohibited transaction exemptions under PTE 2020-02 or PTE 84-24 because the contract does not satisfy the Impartial Conduct Standards, which require care obligations similar to the fiduciary duties of care, skill, prudence, and diligence, and loyalty and reasonable compensation obligations that are negated by John Hancock's excessive spreads that placed its interests ahead of the Plan participants' interests.

75.     The cost of Defendants' failure to adopt and implement prudent policies and processes with regard to the Plan's investment offerings and to instead engage in the prohibited transaction alleged herein -- and of Maersk's failure to oversee the Committee and intervene -- is approximately $10-$22 million since September 1, 2019 and still accruing. This measure of loss is the difference between the Plan's compound fixed annuity earnings from the Hancock FA and the fixed annuity earnings the Plan would have generated had

Defendants acted prudently and offered a competitive fixed annuity product with crediting rates at least as high as TIAA's RC, MassMutual's SAGIC, or Prudential's GIC (as negotiated by IBEW Local 400) during the Class Period. These losses are continuing to accrue and will continue to accrue and all Plan participants will continue to be denied a prudent range of investment options and any investment option with the objectives of a fixed annuity with competitive rates, reasonable spreads, and comparable risk until the Plan removes and replaces the Hancock FA.

## VI.    CLASS ACTION ALLEGATIONS

76.    ERISA, pursuant to 29 U.S.C. § 1132(a)(2) and (a)(3), authorizes a participant or beneficiary of the Plan to bring an action on behalf of the Plan to seek the remedies provided by 29 U.S.C. § 1109(a) and injunctive or other equitable relief. Plaintiffs seek certification of this action as a class action pursuant to these statutory provisions and Federal Rule of Civil Procedure 23.

77.    Plaintiffs assert their claims against Defendants on behalf of a class of participants and beneficiaries of the Plan defined as follows (the "Class"):

> All participants in the Maersk Inc. Savings Plan during the Class Period, along with their beneficiaries and alternate payees of record, excluding the officers and directors of Maersk Inc. and Maersk Agency USA Inc., the members of the Maersk Inc. Pension Committee, and any participant or beneficiary with fiduciary responsibility for the Plan's investments.

78.    Plaintiffs also assert their claims against Defendants on behalf of a subclass of participants and beneficiaries of the Plan defined as follows (the "Subclass"):

> All participants in the Maersk Inc. Savings Plan with a balance in the Plan's fixed annuity investment during the Class Period, along with their beneficiaries and alternate payees of record, excluding the officers and directors of Maersk Inc. and Maersk Agency USA Inc., the members of the Maersk Inc. Pension Committee, and any participant or beneficiary with fiduciary responsibility for the Plan's investments.

79.    All Class members seek plan-wide equitable relief for the Plan as a result of Defendants' mismanagement of the Plan in breach of their fiduciary duties and monetary relief to "make good" the Plan's losses and "restore to such plan any profits" as a result of Defendants' breaches. Members of the Fixed Annuity Subclass also seek monetary relief for their losses due to Defendants' imprudent Hancock FA investment offering.

80.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The members of the Class and Subclass are so numerous – over 6,000 Plan participants -- that joinder of them all is impracticable. As the damages suffered by individual Class and Subclass members is relatively small, the expense and burden of individual litigation would make it impossible for them to individually redress the wrongful conduct. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

81.    Plaintiffs' claims are typical of the Class members' claims because their claims arise from the same courses of conduct, acts, and failures to act as the other Class members. In addition, Plaintiff Reeves' and Plaintiff Manoharan's claims are typical of the Subclass members' claims, as all were invested in the Hancock FA during the Class Period and suffered losses as a result. All Plaintiffs participated in the Plan and were exposed to the same Plan mismanagement and prohibited transaction as all Class members. Defendants managed the Plan uniformly and treated Plaintiffs consistently with other Class members. Defendants' imprudent actions and omissions affected all Class members similarly. Plaintiffs' Reeves' and Manoharan's claims are typical of the Subclass members' claims. Plaintiffs Reeves and Manoharan participated in the Plan and were exposed to the same underperforming returns on the Hancock FA as other Subclass members. Plaintiffs do not allege any individual claims

such as denied benefits, incorrect benefits, or mismanagement of their individual accounts.

82.    Plaintiffs will fairly and adequately protect the interests of the Class and Subclass. Plaintiffs' interests are aligned with the Class and Subclass that they seek to represent, and they have retained counsel and an ERISA expert experienced in complex class action litigation. Plaintiffs do not have any conflicts of interest with any Class or Subclass members that would impair or impede their ability to represent such Class or Subclass members.

83.    Common questions of law and fact exist as to all Class and Subclass members and predominate over any questions solely affecting individual Class or Subclass members, including but not limited to:

    A.    Whether Defendants are fiduciaries of the Plan under ERISA, and the scope of their fiduciary duties;

    B.    Whether Defendants breached their fiduciary duties under ERISA, 29 U.S.C. §1104(a)(1);

    C.    Whether John Hancock is a party in interest under ERISA, 29 U.S.C. § 1002(14);

    D.    Whether Defendants have engaged in a prohibited transaction under 29 U.S.C. § 1106;

    E.    Whether Defendants are liable as co-fiduciaries under ERISA, 29 U.S.C. § 1105(a);

    F.    Whether Defendants' fiduciary breaches caused losses to the Plan;

    G.    The proper form of equitable and injunctive relief; and

    H.    The proper measure of monetary relief.

84.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(1) because prosecution of separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class or Subclass members that would establish incompatible standards of conduct for Defendants and adjudications with respect to

individual Class or Subclass members, as a practical matter, will be dispositive of the interests

of the other persons not parties to the individual adjudications or would substantially impair or

impede their ability to protect their interests. Any award of equitable relief by the Court, such

as removal and replacement of investments or service providers, removal of Plan fiduciaries or

parties in interest, or mandated Plan policies or practices, will be dispositive of non-party

participants' interests. The restoration of assets of the Plan required under 29 U.S.C. §§ 1109

and 1132 will be similarly dispositive of the interests of other Plan participants.

85.    Class certification is also appropriate under Federal Rule of Civil Procedure

23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the

Class and Subclass, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the Class and Subclass as a whole.

**COUNT I**
**Breach of Fiduciary Duties**

86.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of

this Complaint as if fully set forth herein.

87.    Defendants' conduct, as set forth herein, violates their fiduciary duties of loyalty

and prudence under ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (C), in that Defendants failed

and continue to fail to discharge their duties with respect to the Plan solely in the interest of the

Plan's participants and beneficiaries and: (a) for the exclusive purpose of (i) providing benefits

to participants and their beneficiaries and (ii) defraying reasonable expenses of administering

the Plan; and (b) with the care, skill, prudence, and diligence under the circumstances then

prevailing that a prudent man acting in a like capacity and familiar with such matters would use

in the conduct of an enterprise of a like character and with like aims.

88.    As a direct result of Defendants' breaches of fiduciary duties, the Plan has

suffered losses and John Hancock and Mercer have reaped ill-gotten profits.

89.    Pursuant to ERISA, 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3), and 1132(g)(1): (a) Defendants are liable to make good to the Plan the losses suffered by the Plan and participants and restore to the Plan the profits received by Defendants as a result of Defendants' breaches of fiduciary duty; (b) the Court in its discretion may award declaratory, injunctive, or other equitable relief to remedy such unlawful conduct for the benefit of the Plan and its participants and beneficiaries; and (c) the Court in its discretion may award attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### Prohibited Transactions

90.    Defendants also violated and continue to violate ERISA, 29 U.S.C. § 1106, by causing the Plan to engage in and maintain transactions they knew or should have known constituted a direct furnishing of services between the Plan and a party in interest, John Hancock.

91.    As a direct result of Defendants' prohibited transactions, the Plan has suffered losses and John Hancock and Mercer have reaped ill-gotten profits.

92.    Pursuant to ERISA, 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3), and 1132(g)(1): (a) Defendants are liable to make good to the Plan the losses suffered by the Plan and participants and restore to the Plan the profits received by Defendants as a result of Defendants' prohibited transactions; (b) the Court in its discretion may award declaratory, injunctive, or other equitable relief to remedy such unlawful conduct for the benefit of the Plan and its participants and beneficiaries; and (c) the Court in its discretion may award attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT III
### Knowingly Participating in, Concealing, and
### Failing to Cure Breach of Fiduciary Duty

93.     In addition to their own liability under 29 U.S.C. §§ 1104(a)(1) and 1106, each Defendant is liable to the same extent as its co-fiduciaries for their breaches of fiduciary duties under 29 U.S.C. § 1105(a) because it knowingly participated in and/or concealed breaches of fiduciary duty by its co-fiduciaries, enabled its co-fiduciaries to commit breaches of fiduciary duty, and/or knowingly failed to take reasonable measures to cure its co-fiduciaries' breaches of fiduciary duty.

94.     If any Defendant is not deemed a fiduciary or co-fiduciary under ERISA or not liable for a fiduciary's breach of duty, each such Defendant should be enjoined or otherwise subject to remedial, equitable relief to protect the Plan and its participants and beneficiaries from further breaches of fiduciary duty under 29 U.S.C. § 1132(a)(3).

95.     As a direct result of Defendants' knowing participation in, concealment of,  and failure to cure other Defendants' breaches of fiduciary duty, the Plan has suffered losses and John Hancock and Mercer have reaped ill-gotten profits.

96.     Pursuant to ERISA, 29 U.S.C. §§ 1105(a), 1109(a), 1132(a)(2) and (3), and 1132(g)(1): (a) Defendants are liable to make good to the Plan the losses suffered by the Plan and participants and restore to the Plan the profits received by Defendants as a result of Defendants' breaches of fiduciary duty; (b) the Court in its discretion may award declaratory, injunctive, or other equitable relief to remedy such unlawful conduct for the benefit of the Plan and its participants and beneficiaries; and (c) the Court in its discretion may award attorneys' fees, costs and other recoverable expenses of litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the Plan and all similarly situated Plan participants and beneficiaries, request that the Court:

A.  Determine that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiffs as the Class representatives, and appoint Plaintiffs' counsel as Class counsel;

B.  Find and declare that Defendants breached their fiduciary duties as described herein;

C.  Find and declare that the Hancock FA was a prohibited transaction under ERISA;

D.  Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to restore to the Plan all profits they received as a result of their breaches, including by surcharge and disgorgement;

E.  Determine the method by which Plan losses and Defendants' profits under 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3) should be calculated;

F.  Order Defendants to provide an accounting to determine the losses Defendants must make good to the Plan and the profits Defendants must restore to the Plan under 29 U.S.C. §§ 1 109(a) and 1132 (a)(2) and (3);

G.  Order injunctive or other remedial and equitable relief the Court finds appropriate to rectify the mismanagement of the Plan as described herein;

H.  Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(l) and the common fund doctrine;

I.  Order the payment of pre- and post-judgment interest to the extent it is allowed by law; and

J.  Grant such other equitable or remedial relief as the Court deems appropriate.

SHANNON REEVES, THURUPARAN
MANOHARAN, ANTHONY GARCIA, and
MATTHEW HOWARD, as representatives of a class
of similarly situated persons, and on behalf of the
Maersk Inc. Savings Plan

By Their Attorneys,

David H. Rich (BBO #634275)
**TODD & WELD LLP**
One Federal Street, 27th Floor
Boston, MA 02110
Phone: (617) 720-2626
Email:  Drich@toddweld.com


Charles J. LaDuca (*pro hac vice* motion forthcoming)
Michael Lenett (*pro hac vice* motion forthcoming)
Brendan Thompson (*pro hac vice* motion forthcoming)
**CUNEO GILBERT & LADUCA, LLP**
2445 M Street, N.W., Suite 740
Washington, D.C. 20037
Phone: (202) 789-3960
Email:  Mlenett@cuneolaw.com
          Brendant@cuneolaw.com


Charles Barrett (*pro hac vice* motion forthcoming)
**CUNEO GILBERT & LADUCA, LLP**
4235 Hillsboro Pike, Suite 300
Nashville, TN 37215
Phone: (202) 844-3647
Email:  Cbarrett@cuneolaw.com


Dated: September 2, 2025